ADKINS, Justice
(dissenting):
These cases were consolidated by order of this Court. For clarity, West Flagler Associates, Ltd. is referred to as “Flagler,” Miami Beach Kennel Club, Inc. is referred to as “Miami Beach,” Board of Business Regulation is referred to as “Board,” Division of Pari-Mutuel Wagering is referred to as “Division,” and Biscayne Kennel Club, Inc. is referred to as “Biscayne.”
Flagler and Miami Beach say that the Board’s order setting racing dates should be quashed in whole or in part, and Biscayne says the Board’s order should be sustained. The Board’s order set the racing dates as follows:
West Flagler September 5, 1972 through January 3, 1973
Miami Beach January 4, 1973 through May 4, 1973
Biscayne May 5, 1973 through September 4, 1973
Flagler contended that the order should be quashed because the decision of the Board was totally contrary to the factors established for the fixing of racing dates, and the decision was unsupported by the evidence submitted to the Board. The District Court of Appeal held that the order of the Board was in keeping with the requirements established by the prior decisions of this Court.
The Board in its order referred to our decisions in West Flagler Associates, Ltd. v. Board of Business Regulation, 251 So.2d 855 (Fla.1971), and Gulfstream Park Racing Association, Inc. v. Division of Pari-Mutuel Wagering, 253 So.2d 429 (Fla.1971), and said that:
“[I]n order to afford equality of opportunity to Biscayne and to arm the Board with information necessary to make equitable awards of dates in the future, the Board finds that it should award Biscayne the so called summer dates.”
The District Court of Appeal held that the Board exercised reasonable discretion in its determination of the factors established for fixing of racing dates and said:
“Furthermore, in the cases of Gulfstream Park Racing Association, Inc. v. Division of Pari-Mutuel Wagering, Fla.1971, 253 So.2d 429, and Hialeah Race Course, Inc. v. Gulfstream Park Racing Association, Inc., Fla.1971, 245 So.2d 625, the Supreme Court stated that the awarding authority must apportion racing dates so as to award tracks of comparable facilities a substantially equal opportunity for the beneficial enjoyment of their permits and the realization of their permit opportunities.”
When all of the decisions of this Court are read, it is not too difficult to determine the priority of factors to be considered in allocating racing dates. There is no question that the principal interest which the State has in Pari-Mutuel Wagering centers upon the revenue gained by the State from the operation of the various tracks. Although revenue is not the sole and exclusive factor to be considered, it is a principal and substantial factor. State ex rel. Hollywood Jockey Club, Inc. v. Stein, 129 Fla. 777, 176 So. 849 (1937); Biscayne Kennel Club, Inc. v. Florida State Racing Commission, 165 So.2d 762 (Fla.1964). The interest of the State should be of paramount concern in the fixing of racing dates. See Hialeah Race Course, Inc. v. Gulfstream Park Racing Ass’n, Inc., 37 So.2d 692 (Fla.1948); West Flagler Associates, Ltd. v. Board of Business Regulation, 241 So.2d 369 (Fla.1970).
Other factors to be considered in fixing racing dates are:
(a) The interest of the track owner;
(b) The good will;
(c) The quality of the dogs;
(d) Geography;
*511 (e) The track facilities; and
(f) Skill in management.
See State ex rel. West Flagler Kennel Club, Inc. v. Florida State Racing Commission, 74 So.2d 691 (Fla.1954). The factor of “equal opportunity” was discussed in Gulfstream Park Racing Association, Inc. v. Division of Pari-Mutuel Wagering, supra. Gulfstream had suffered a statutory discrimination for more than twenty years in that the Hialeah track was given the prime racing dates by virtue of Fla.Stat. § 550.081, F.S.A. Gulfstream made several contentions concerning the ownership and operation of the Hialeah track which, if true, could be a detriment to the Florida racing industry. In declaring the statute unconstitutional and giving Gulfstream an opportunity to operate during the prime racing dates, this Court observed:
“Whether these contentions of Gulf-stream have particular merit or not, we are unable to say. However, they do raise certain inferences that a ‘change’ of scheduling of racing dates between Gulf-stream and Hialeah may prove that competition is advantageous to the state, especially in viezv of the official records of the Division of Pari-Mtituel Wagering which reflect that horse racing has not kept pace with the pari-mutuel industry in Florida.” (Emphasis supplied) 253 So.2d 429, 433.
It is thus apparent that the Court continued to recognize the interest of the State as being of paramount concern. Upon a showing of loss of revenue to the State, the “equal opportunity” factor became an important one. The Board in the case sub judice did not give other factors appropriate priority when it awarded the racing dates for the purpose of affording “equality of opportunity to Biscayne and to arm the Board with information necessary to make equitable awards of dates in the future.” By approving this action of the Board, the decision of the District Court of Appeal was in conflict with the decisions of this Court setting forth the factors to be considered in fixing the racing dates. We have jurisdiction.
The reasoning of the Board becomes apparent when we consider the statement of its attorney to the members of the Board that “the Court is telling you that you should award Biscayne the summer dates” and “the Court has told you . . . you should have to give Biscayne the summer dates.” In reply to this, one member moved that the summer dates be awarded to Biscayne “as long as you inform us they have laid down the mandate.” Another member expressed doubt that Biscayne would be able to equal or exceed the betting handle of Flagler but “under the circumstances of the Supreme Court decision, based upon counsel’s advice, I think there is no other way this Board can go.” Another member said, “It’s clearcut what they said we have to do.” Another member comments, “I feel we have no choice, also.” Confused construction of our prior opinion was the obvious motivation for the decision of the Board, instead of the factors prescribed by our numerous prior decisions.
The record discloses that Flagler has historically out-produced the other dog tracks and currently leads all dog tracks in the State in revenue production. For the 1970-1971 season, Flagler handled $66,934,-102 ($19,000,000 more than any other dog track in the State) and a total attendance of 1,017,289 (200,000 more than any other pari-mutuel operation in the State.) Seven times Flagler’s total nighttime and matinee betting handle in one day has exceeded $1,000,000. By contrast, Biscayne has had very few nighttime handles in excess of $600,000, and on very few occasions did its total nighttime and matinee handle exceed $1,000,000. Biscayne explains that this differential may be due to Flagler’s operating at a “better” time of the year.
To answer this, Flagler compared the last six nights of Biscayne’s 1971 winter meeting (April 28-May 4) with the immediately following first six nights of Flagler’s 1971 summer meeting (May 5-May 11). This indicated that Flagler had an increase over *512 Biscayne of 16.2% in betting handle and 36.1% in attendance from one week to the next. Flagler then compared Biscayne’s last sixteen nights with Flagler’s first sixteen nights and Biscayne’s last twenty-two days with Flagler’s first twenty-two days. This comparison reflected dramatic percentage increases by Flagler over Biscayne in betting handle and attendance.
Biscayne failed to run the entire number of matinees that the Board’s policy allowed. This failure was explained as a management decision in that to do so would not be profitable for the State. Flagler says it has never lost money on a matinee performance.
Flagler pioneered many innovations in the greyhound industry, such as the film patrol, closed circuit television, true owner’s name on program, hurdle races, large stakes races, and quínela tote board, which have subsequently been adopted by other greyhound tracks in the State. A documentary film was produced by Flagler and widely distributed throughout the country to stimulate interest in the greyhound industry.
We said in West Flagler Associates, Ltd. v. Division of Pari-Mutuel Wagering, 251 So.2d 856 (Fla.1971) :
“So far as the evidence before the Board and the record here are concerned, there does not appear to be any substantial change from the situation as it was at the time these matters were before this Court only last year when we considered the matter at length in West Flagler Associates, supra, and there settled upon equitable dates based upon that evidence.” (p. 860)
This still holds true. It would probably take many years of changing dates to get a fair comparison because of weather conditions, changing competition, and the various entertainment activities in Dade County, as the county continues its tremendous growth in population. In twenty years the summer has replaced the winter as a choice season. The distinction between the summer season, fall season and winter season should become less as time passes. We should not now speculate with the State revenue and should hold as we have in the past cases that there must be a substantial change which would be to the State’s best interest in order to alter the racing dates.
There was no evidence in the record to show any substantial change on the part of any track to produce pari-mutuel handle and State revenue. The record as a whole indicates that the only reason the Board acted as it did was because their attorney stated that this Court had mandated the racing dates. If there were such a mandate, it could be applicable only if the record disclosed a change of circumstances.
I agree with that portion of the opinion of the District Court of Appeal sustaining the allocation of the winter dates, January 4, 1973 through May 4, 1973, to Miami Beach.
It is unfortunate that the owners of the various tracks cannot mutually agree upon racing dates which will be most beneficial to the tracks as well as the State of Florida. This type of litigation has become a distasteful chore to the Court. Regardless of any conclusions that may be drawn from any previous decision, the criteria listed above should always be followed by the Board in fixing racing dates. It is the duty of the Board to look first to the interest of the State and secondly to the interest of the permit holders.
The District Court of Appeal held that Fla.Stat. § 550.083(1), F.S.A., requires the selections and allocations of dates for dog racing permittees to be on the fiscal year basis (July 1 through June 30), and that this statute should be followed by the Board in the future. The statute in question reads as follows:
“Owners of valid outstanding permits for dog racing in this state may hold race meetings at any time they choose *513 during the fiscal year for the aggregate number of racing days fixed and' permitted by law and subject to the approval of the board of business regulation; provided, that no racing shall be conducted on Sunday.” (Emphasis supplied)
Prior to its amendment in 1969, the statute provided that the race meetings could be held at any time “during the calendar year.” In other words, the amendment substituted the words “fiscal year” for “calendar year.”
This portion of the decision of the District Court of Appeal is in conflict with the decision of this Court in West Flagler Associates, Ltd. v. Board of Business Regulation, supra, (241 So.2d, at page 377).
The statutes refer to “racing season” in connection with establishing racing days. See Fla.Stat. § S50.08, F.S.A. Even when the term “calendar year” was used in Fla. Stat. § 550.083, F.S.A., the racing days were always established during the fall, winter and summer of the “racing season.” The only effect of Fla.Stat. § 550.083, F. S.A., was to eliminate any further distinction between summer and winter racing seasons, and to permit year-around greyhound racing by any track, subject to the approval of the Board. It has been invariably the practice of the Board and its predecessor, the State Racing Commission, to issue annual licenses and annually fix and allocate the racing dates of the Florida Greyhound tracks for the period of September of each year to September of the following year. Such administrative construction of the statutes by the agency or body charged with its administration is entitled to great weight and will not be overturned unless clearly erroneous. United States Gypsum Company v. Green, 110 So.2d 409 (Fla.1959); State ex rel. Volusia Jai-Alai, Inc. v. Ring, 122 So.2d 4 (Fla.1960); Warnock v. Florida Hotel and Restaurant Commission, 178 So.2d 917 (Fla.App.3d, 1965). This Court in two successive years fixed racing dates for the Dade County tracks on this basis. West Flagler Associates, Ltd. v. Board of Business Regulation, supra, (fixed dates of September 3, 1971 through September 2, 1972), and West Flagler Associates, Ltd. v. Division of Pari-Mutuel Wagering, supra, (fixed dates of September 3, 1971 through September 4, 1972).
I hold that the selections and allocations of dates for dog racing permittees were not required to be on a fiscal year basis and the Board may award dates for a September to September period as has been done in the past.
There being no evidence of any substantial change in the situation as it has existed for the past two years, and considering the factors outlined above, I believe the racing dates should be allocated as follows:
Biscayne September 5, 1972 through January 3, 1973
Miami Beach January 4, 1973 through May 4, 1973
Flagler May 5, 1973 through September 4, 1973
Frankly, where millions of dollars of taxpayers’ money are involved in the operation of racing plants, with additional millions of dollars of private capital invested in these facilities, such action by an appointed board always merits the very closest scrutiny.
Irrespective of the degree of power vested in any regulatory board by the legislature of this State, the laws must be administered fairly, justly and impartially. The public interest must be first and always served.
If the legislature, as would be its prerogative, should desire to award the finest greyhound racing dates to the very smallest track in Dade County, with its attendant loss of millions of dollars of revenue to the State, let it speak. Until that time, however, I maintain my unalterable position that the generation of revenue for the State is the prime reason for permitting pari-mutuel gambling.
The decision of the District Court of Appeal should be quashed.
CARLTON and McCAIN, JJ., concur.